# Exhibit A

 

February 7, 2025

Sent via SecureRelease Portal

U.S. Immigration and Customs Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009

Re:    Freedom of Information Act Request for Records of ICE transfers of detained individuals

Dear Freedom of Information Officer:

The American Immigration Council (the "Council") and Rocky Mountain Immigrant Advocacy Network ("RMIAN") submit this request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to obtain information regarding U.S. Immigration and Customs Enforcement's ("ICE") implementation of ICE Policy 11022.1: Detainee Transfers (the "Policy") enclosed as Exhibit A.[1] Requestors seek a fee waiver of any fee imposed by the agency because the records sought will contribute to the public's understanding of ICE operations and release of the information is not in Requestors' commercial interest.

I.    REQUEST FOR INFORMATION

Requestors seek records prepared, possessed, received, transmitted, collected, maintained, or controlled by ICE as described below.

1. Directives, guidelines, manuals, procedures, policies, and other similar records amending, updating, supplementing, implementing, or limiting the application of, the Policy, in effect between January 4, 2012, and the date the agency completes a reasonable search, including but not limited to such records addressing the following topics:
   a. Making a transfer determination;
   b. Selecting a transfer destination;
   c. Transferring detained individuals;
   d. Transporting detained individuals (e.g., the "protocols for ICE chartered removals" referenced in Section 5.14 of the Policy);
   e. Documenting, destroying, disposing of, sending, storing, and otherwise processing a detained individual's funds, legal materials, small valuables, and other property;
   f. Obtaining clearance by medical staff prior to transfer;
   g. Providing medical escort or specialized care during transfer;
   h. Ensuring that medication accompanies a detained individual during transfer;

---

[1] U.S. Immigr. & Customs Enf't, 305-112-002b, Policy 11022.1 Detainee Transfers (Jan. 4, 2012), https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf.

      i.   Obtaining, consolidating, maintaining, forwarding, and transferring a detained individual's a-file, temporary file, work folder, or other agency compilation of immigration records;

      j.   Notifying any attorney of record of a transfer; and

      k.   Updating ENFORCE, CARIER, or any other agency database with information about the transfer.

2.   Statistics maintained by all Field Office Directors, or their designees, on transfers as required by Section 5.16 of the Policy from January 1, 2018, until the time the agency completes a reasonable search.

3.   A blank copy of any form or checklist referenced in the Policy[2] in effect between January 15, 2025, and the date the agency completes a reasonable search, including but not limited to the following:

      a.   I-794, as referenced in Section 5.4,

      b.   USM-553, as referenced in Sections 5.4, 5.6, and 5.11;

      c.   G-589/I-77, as referenced in Sections 5.6 and 5.13;

      d.   Detainee Transfer Checklist, as referenced in Sections 5.5 and 7.1;

      e.   G-391, 1-213, 1-216, 1-203/1-203A, as referenced in Sections 5.4, 5.6, and 5.12; and

      f.   I-830, as referenced in Section 5.3

4.   The following records for the New York Field Office, San Diego Field Office, Denver Field Office, and Atlanta Field Office only:

      a.   Protocols developed by Field Office Directors, or their designees, to ensure the exchange of information as specified under Section 4.2 of the Policy, including but not limited to protocols to address changes in court venue after a transfer;

      b.   Emails, faxes, and other records of communications and correspondence sent or received by Field Office Directors, Assistant Field Office Directors, or ICE Supervisory Immigration Officers regarding transfer determinations for individuals detained in their area of responsibility during calendar year 2024.

      c.   Copies of the Detainee Transfer checklist for each individual transferred in calendar year 2024 under the Policy.

      d.   Copies of Form I-216 for each individual transferred in calendar year 2024 under the Policy.

      e.   Directives, guidelines, procedures, policies, processes, or other similar records about the quality assurance process established by the Field Office Directors to monitor transfer decisions pursuant to Section 5.16 of the Policy effective between January 4, 2012, and the date the agency completes a reasonable search; and

      f.   Emails and other communications by Field Office Directors or their designees between January 4, 2012, and the date the agency completes a reasonable search referencing the operative quality assurance process to monitor transfer decisions pursuant to Section 5.16 of the Policy.

---

[2] The agency should construe "any form or checklist referenced in the Policy" to include forms and checklists that are the functional equivalent of a form or checklist referenced in the Policy but bear a different name.

II.       POTENTIAL CUSTODIANS

Potential custodians of these records include, but are not limited to, the Office of Enforcement and Removal Operations ("ERO") and subunits therein such as each ICE Field Office and the ERO Flight Operations Unit.

III.      FORMAT OF PRODUCTION

Requestors seek responsive electronic records in a machine-readable, native file format, with all metadata and load files. We request that any data be provided in a workable format, such as Microsoft Excel or comma-separated values (CSV) files. If terms or codes are not in the form template and/or publicly defined, please provide a glossary or other descriptive records containing definitions of acronyms, numerical codes, or terms contained in data responsive to this request. We request that you produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits. For non-data files, Requestors ask that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

IV.       FEE WAIVER REQUEST

Requestors seek a fee waiver on the grounds that disclosure of the requested records is in the public interest and is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in [their] commercial interest."  5 U.S.C. § 552(a)(4)(A)(iii).

1.    *Disclosure of the Information Is in the Public Interest*

The public interest criteria are satisfied when (1) the request concerns operations or activities of the government; (2) disclosure is likely to contribute to an understanding of government operations or activities; (3) disclosure contributes to an understanding of the subject by the public at large; and (4) disclosure is likely to contribute significantly to such understanding.[3]

ICE is the component within the U.S. Department of Homeland Security ("DHS") that manages the nation's civil immigration detention through its Enforcement and Removal Operations ("ERO") unit.[4] In FY 2024, ERO took nearly 278,000 people into custody.[5] It also transported noncitizens between detention facilities, to and from medical appointments, to relieve overcrowding along the southwest border, and to stage those who have received final orders of removal.[6]

ICE has adopted several sets of detention standards that describe the requirements and responsibilities to

---

[3] 6 C.F.R. § 5.11(k)(2) (2017) (DHS regulations outlining criteria for responses to requests for fee waivers under FOIA); see *also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1126 (D.C. Cir. 2004) (citing 28 C.F.R. § 16.1(k)(2)).
[4] U.S. Immigr. & Customs Enf't, Annual Report – Fiscal Year 2024, 22 (Dec. 19, 2024), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf.
[5] *Id.* at 21.
[6] *Id.*

which detention facilities housing detained immigrants must adhere, including Policy 11022.1. This policy governs how field offices make determinations about transfers of detained individuals.[7] Since the Policy went into effect on January 4, 2012, the agency has not published records of agency guidance implementing the Policy and it is not known whether the agency collects the data required by the Policy. However, ICE published National Detention Standard for detention facilities operating under contracts in 2019, which included guidance on "Detainee Transfers," i.e. Standard 7.2, that repeat some of the guidance in the Policy.[8] The 2019 detention standards, however, failed to instruct facilities as to record keeping during transfers.

Thus, the agency's information on the transfer of individuals from one detention center to another is limited, scattered, and difficult to access. Requestors seek the information in the request to inform the public about the circumstances that may lead to the transfer of individuals, as well as the procedures ICE must follow to ensure the safety and dignity of the individuals transferred and the protection of their rights to due process.

As such, this request is in the public interest because it meets all the elements outlined in the applicable regulations. First, Requestors seek records relating to ICE's procedures for transferring individuals in its custody from one detention facility to another. ICE is a government agency under the FOIA and for purposes of the applicable regulations. Accordingly, this request meets the first requirement because it seeks records concerning the operations of a government agency.

Second, disclosure of the requested procedures and data will contribute to an understanding of these operations because it seeks records not previously produced by ICE with the goal of consolidating information about ICE's protocols when transferring individuals from one detention site to another. Despite the Policy's requirement that the agency maintain data for quality assurance purposes, ICE has not reported this data to the public. The Policy also suggests that Field Office Directors adopt protocols to monitor transfers, information which also has not been available to the public. Due to this lack of information, it is difficult for the public to assess how frequently ICE transfers people in detention, and under what circumstances it does so. Additionally, the dearth of new public guidance on this issue leads to a lack of knowledge about the true circumstances that lead to individuals' transfers while detained.

Additionally, disclosure of the information will contribute to the public's understanding of this practice. A recent report highlights anecdotal evidence of numerous recent transfers occurring throughout ICE Field Offices across the country.[9] The report also noted that ICE has not provided data about transfers to the public since 2011.[10] The lack of information from ICE is so drastic that the Senate's Statement for the proposed Homeland Security Appropriations Bill for 2025 included a requirement that ICE report on

---

[7] Policy 11022.1 Detainee Transfers, *supra* n. 1.

[8] U.S. Immigr. & Customs Enf't, National Detention Standard 7.2 – Detainee Transfers (2019), https://www.ice.gov/doclib/detention-standards/2019/7_2.pdf.

[9] Freedom for Immigrants, Trafficked & Tortured—Mapping Ice Transfers (Feb. 16, 2023), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/63ed9236ee82156a4608eba2/1676513859587/FInal+Report_FFI_T%26T_021523.pdf

[10] *Id.* at 3.

measures adopted by the agency to comply with Policy 11022.1.[11] Members of Congress also expressed concern over the practice and called for an end to transfers of individuals in detention in 2021.[12] The Senators indicated that ICE transferred dozens of people detained in New Jersey to detention facilities in Alabama, Georgia, and Louisiana.[13]

Media reports have documented the harms immigrants encounter when transferred from one location to another. For example, transfers from a detention facility that is close to an immigrant's home to a detention center farther away can make it more difficult for an immigrant facing removal to obtain legal representation.[14] This is particularly problematic when individuals in ICE custody obtained legal counsel but the agency nonetheless transfers individuals out of the service area without properly notifying the individuals' attorney of record (a violation of Policy 11022.1), as laid out in the letter by the American Bar Association to ICE's Acting Director Patrick Lechleitner this past October.[15] Due to the problematic disruptions caused by transfers to attorneys' zealous representation of their clients, advocates believe that these transfers may be punitive.[16] Further, scholars have theorized that ICE transfers also may occur selectively to choose jurisdictions where ICE can secure the detention of individuals through immigration judges that commonly deny release on bond or foreclose the possibility of relief entirely.[17] Release of the records requested herein will provide the public at large with a better understanding of why these transfers occurred.

Finally, the agency's disclosure of these records to Requestors will significantly contribute to the public's understanding of how transfers occur because ICE has not provided information to the public about transfers. Despite requests from the public and congressional leaders, ICE has not produced information to clarify how often it conducts transfers. While ICE claims that the agency follows the transfer policy,[18] evidence suggests that this is not always the case.

Requestors seek to disseminate the information received from the agency through its publicly available channels to contribute to the scholarship and public understanding of ICE's implementation of this policy.

---

[11] Staff of S. Comm. on Appropriations, 118th Cong., Explanatory Statement for the Homeland Security Appropriations Bill 2025 (2024), https://www.appropriations.senate.gov/imo/media/doc/fy25_homeland_security_senate_report.PDF

[12] Letter from Cory A. Booker & Robert Mendez, U.S. Senators, to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't, (Sept. 21, 2021), https://www.booker.senate.gov/news/press/booker-menendez-urge-ice-to-end-transfer-of-detainees-out-of-new-jersey

[13] *Id.*

[14] Giulia McDonnell Nieto del Rio, *Detention Transfers Separate Immigrants from Legal Representation*, Documented (July 6, 2022), https://documentedny.com/2022/07/06/ice-immigration-legal-transfers/.

[15] Letter from William R. Bay, President, Am. Bar Ass'n, to Patrick J. Lechleitner, Acting Dir., U.S. Immigr. & Customs Enf't (Oct. 23, 2024), https://www.americanbar.org/content/dam/aba/administrative/government_affairs_office/imm-omdc-2d-transfer-letter-23-oct-2024.pdf.

[16] Daniel Parra, *ICE Transfers Detained Immigrants from NY Jail Without Notice*, City Limits (July 26, 2022), https://citylimits.org/2022/07/26/ice-transfers-detained-immigrants-from-ny-jail-without-notice/.

[17] Roger Grantham, *Detainee Transfers & Immigration Judges: ICE Forum-Shopping Tactics in Removal Proceedings*, 53 Ga. L.R. 281, 301-06 (2018), https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1015&context=glr.

[18] Nieto del Rio, *supra* n. 14.

The Council is a non-partisan organization with vast experience in disseminating information related to immigration in the United States, including information obtained through the FOIA. The Council, a non-profit organization, regularly provides information, including fact sheets, reports and other publications to the public based on its FOIA requests.[19] This information reaches a wide audience, which includes varied segments of the U.S. public. The Council intends to provide information received in response to this FOIA request on its publicly accessible website. In 2022, the Council received more than 4.5 million pageviews from almost 3 million visitors. The Council also regularly shares information with national print and news media and plans to distribute information obtained from these FOIA disclosures to interested media. In keeping with its track record of synthesizing or otherwise publishing information on governmental operations shared in responses to FOIA requests, the Council intends to provide information received in response to this FOIA request on its publicly accessible website.

RMIAN plays a key role in educating members of the community, as well as the legal community in the Rocky Mountain region and beyond. One of RMIAN's goals is to promote knowledge of legal rights. To achieve this goal, RMIAN conducts Know Your Rights presentations in the Aurora Contract Detention Facility, where it provides group presentations, general information, and individual intakes. In 2023, RMIAN staff conducted 206 of these presentations for people in detention. RMIAN also strives to increase access to counsel, both through direct representation of clients as well as through placing cases with volunteer attorneys. RMIAN creates and shares educational resources and pro bono trainings about different aspects of the immigration system, including for individuals in detention. For example, RMIAN published a pamphlet with information about posting bond, how to locate a loved one in ICE custody, and accessing visits at the Aurora Contract Detention Facility in Colorado. The information is available on RMIAN's website and accessible free of charge. RMIAN also works to improve conditions of immigration detention by challenging detention practices that violate agency policy and the law. The information sought by this request will assist RMIAN clients and their families gain greater knowledge about when their loved ones might be moved to a different detention facility.

Requestors' demonstrated ability to effectively convey and disseminate information requested will contribute to the public's understanding of ICE's implementation of this policy since 2012, an issue of considerable public interest. Further, Requestors' commitment to share this information widely and free

---

[19] *See, e.g.*, American Immigration Council, "Government Documents Reveal Information about the Development of the CBP One App," (Feb. 28, 2023), https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app; American Immigration Council, "The Electronic Nationality Verification Program: An Overview," (Jan. 26, 2021), https://www.americanimmigrationcouncil.org/research/electronic-nationality-verification-program-overview; Guillermo Cantor *et al.*, "Changing Patterns of Interior Immigration Enforcement in the United States," 2016 -2018, American Immigration Council (July 1, 2019), https://americanimmigrationcouncil.org/research/interior-immigration-enforcement-united-states-2016-2018; American Immigration Council, "Stays of Removal Responses from EOIR" (May 2019), https://americanimmigrationcouncil.org/sites/default/files/foia_documents/board_of_immigration_appeals_interpretation_of_stay_of_removal_foia_production.pdf; Guillermo Cantor & Walter Ewing, "Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered, American Immigration Council" (Aug. 2017), http://bit.ly/Council_StillNoActionTaken.

of charge among its networks of website visitors and supporters ensures that disclosure is likely to significantly contribute to the public's understanding of the issue.

Thus, the request for information meets the public interest element for the fee waiver request rule.

2.    *Disclosure of the Information Is not in Requestors' Commercial Interest.*

Requestors have no commercial interest in the records requested, and this request aims at furthering public understanding of government conduct: specifically, as described above, the urgent need for the public to understand how often ICE carries out transfers and whether there are any other reasons for these transfers beyond operational needs of the detention facilities.

Requestors, as non-for-profit organizations, have no commercial interest in the present request. This request furthers the Councils' work to increase public understanding of immigration law and policy, advocate for the fair and just administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. As with all other reports and information available on the Council's website, as well as information frequently disseminated to the public via electronic newsletters, the information the Councils receives in response to this FOIA request will be available to immigration attorneys, noncitizens, policymakers, and other interested members of the public free of charge. Likewise, RMIAN's mission is to promote knowledge of legal rights and provide pro bono representation to immigrants in removal proceedings. One of RMIAN's strategies is to recruit and train pro bono attorneys to assist vulnerable migrants who would otherwise not be able to afford legal services. The records sought would be part of the many resources RMIAN provides for free to its own attorneys, pro bono lawyers, and other advocates to ensure immigrants access to due process.

As FOIA's fee-waiver requirements must be liberally construed in favor of waivers for noncommercial requestors, a waiver of all fees is justified and warranted in this case.

Thank you for your attention to this request. If you have any questions regarding this request, please do not hesitate to contact us.

Very truly yours,


_____/s/ Raul Pinto_____          _____/s/ Laura Lunn_____
Raul A. Pinto,                                     Laura Lunn
Deputy Legal Director for Transparency             Director of Advocacy and Litigation
American Immigration Council                       Rocky Mountain Immigrant Advocacy Network
Tel. (202) 507-7549                                Tel. Phone: (720) 370-9100
Email: rpinto@immcouncil.org                       Email: llunn@rmian.org

# Exhibit A

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

## Policy 11022.1:  Detainee Transfers

**Issue Date:**          **January 4, 2012**
**Effective Date:**   **January 4, 2012**
**Superseded:**       All Immigration and Customs Enforcement (ICE) documents
that reference or provide guidance related to detainee transfers
must be revised in accordance with this Directive.
**Federal Enterprise Architecture Number:**  306-112-002b

1.      **Purpose/Background.**  This Directive establishes new prioritized transfer determinations that are meant to minimize, to the extent possible, detainee transfers outside the area of responsibility and to provide cost savings to the agency.

This Directive consolidates and revises existing policies on how field offices make detainee transfer determinations and conducts transfers out of the Area of Responsibility (AOR).  Transfers of detainees within the AOR are not covered by this Directive.

This Directive establishes responsibilities and procedures for ICE employees who perform detainee transfers and does not govern contract staff.  ICE employees are advised that responsibilities and procedures for contract staff can be found in their respective vendor agreements

2.      **Policy.**  All detainee transfers and transfer determinations will be based on a thorough and systematic review of the most current information available.

3.      **Definitions.**  The following definitions apply for purposes of this Directive only.

3.1.    **Area of Responsibility (AOR).**  The geographic area of responsibility under the authority of a Field Office Director (FOD).

3.2.    **Detainee transfer.**  The transfer of a detainee from one AOR to another.  The term does not include intake processing, or the transfer of aliens from facilities that are authorized for less than 72 hours, hold rooms, U.S. Customs and Border Protection Border Patrol stations, or Ports of Entry.  The term detainee transfer does not include the transfer of aliens to staging areas or facilities for the purpose of facilitating a scheduled final removal of aliens from the United States, nor does it include the final removal of aliens from the United States.

3.3.    **Immediate family.**  This may include: mothers, fathers, step-parents, foster parents, brothers, sisters, stepbrothers, stepsisters, biological and adopted children, stepchildren, foster children, and spouses, including common-law marriage or civil unions and

2

cohabitating domestic partnerships legally recognized by a state or other governmental entity (e.g. District of Columbia, Puerto Rico, Guam).

**3.4.    Workday(s).** Monday through Friday excluding holidays or other local Enforcement and Removal Operations (ERO)/Executive Office for Immigration Review (EOIR) office closures.

**4.     Responsibilities.**

**4.1.    FODs, Supervisory Immigration Officers, Attorneys, Immigration Officers and Medical Staff** are responsible for complying with the policy and procedures set forth in this Directive.

**4.2.    FODs** are responsible for disseminating and enforcing this Directive and in conjunction with the Office of the Principal Legal Advisor (OPLA), developing protocols with EOIR court administrators within their AOR that ensure a regular exchange of timely and accurate hearing and detainee transfer schedule information.

**5.     Procedures.**

**5.1.    Filing of the Notice to Appear (NTA) for Transfers.** Unless impracticable because of logistical or other compelling factors that delay submission on a temporary or ongoing basis, NTAs will be submitted to EOIR within five (5) workdays of the NTA being served on the alien, or upon the alien entering ICE custody, whichever is later. Proper submission of an NTA does not require delivery confirmation, receipt or further action by EOIR. NTAs mailed to EOIR will only require postmark within the five (5) workdays to be considered timely. All NTAs mailed will utilize a service which tracks mailing and receipt dates.

As a general rule, detainees will not be transferred without the A-Files, T-Files, or work folders. If an A-File, T-File, or work folder does not accompany the transferred alien, the five (5) workdays provided for submitting the NTA to EOIR will not begin until the appropriate case officer, agent or other ICE employee who submits NTAs to EOIR receives the A-File, T-File or work folder.

**5.2.    Transfer Determinations.**

1)  Unless a transfer is deemed necessary by a FOD or his or her designee under paragraph (3) of this section, ICE Supervisory Immigration Officer(s) will not transfer a detainee when there is documentation to support the following:

a)  Immediate family within the AOR;

b)  An attorney of record (Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative* on file) within the AOR;

3

   c)  Pending or on-going removal proceedings, where notification of such proceedings has been given, within the AOR; or

   d)  Been granted bond or has been scheduled for a bond hearing.

2) The Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File.

3) A transfer may be deemed necessary by a FOD or his or her designee for any of the following reasons:

   a)  To provide appropriate medical or mental health care to the detainee.

   b)  To fulfill an approved transfer request by the detainee.

   c)  For the safety and security of the detainee, other detainees, detention personnel or any ICE employee.

   d)  At ICE's discretion, for the convenience of the agency when the venue of EOIR proceedings is different than the venue in which the alien is detained.

   e)  To transfer to a more appropriate detention facility based on the detainee's individual circumstances and risk factors.

   f)  Termination of facility use due to failure to meet ICE detention standards, lack of sufficient use of the facility by ICE, or emergent situations.

   g)  To relieve or prevent facility overcrowding; in such cases, efforts should first be made to identify for transfer those detainees who do not meet any of the criteria listed in section 5.2(1).

4) *Orantes* Class Members.

   a)  ICE is prohibited from transferring Salvadoran class members who are not represented by counsel, from the judicial district of their apprehension for at least seven days to afford them the opportunity to secure counsel.

      i)  The only exception to this rule applies to class members who are subject to expedited removal final orders. See *Orantes-Hernandez v. Gonzales*, No. 82-01107, Modified Consolidated Injunction, at paragraph 11.b. (C.D. Cal. Nov. 26, 2007*).*

---

4

    b) Salvadoran class members who *are* represented by counsel or obtain
    representation within the seven-day period can be transferred to other locations,
    but venue remains in the judicial district where each member's counsel is located.

    c) For any questions regarding the treatment of Salvadoran nationals in ICE custody,
    pursuant to the requirements of the *Orantes* settlement agreement, please contact
    the local ICE Office of Chief Counsel.

5) ICE Supervisory Immigration Officers will conduct a thorough review of the most
current information available to make all detainee transfer determinations.

**5.3.    Notifications in the Event of a Detainee Transfer.**

1) ICE will ensure that all necessary notifications are made to detainees and their
attorneys when detainees are transferred.  ICE is not required to notify family
members or other third parties of a transfer.

2) <u>Attorney notification</u>.  If a detainee has an attorney of record (Form G-28 on file), the
sending field office will:

    a) Notify the attorney that the detainee is being transferred and include the reason
    for the transfer and the name, location, and telephone number of the new facility
    as soon as practicable on the day of the transfer, but in no circumstances later than
    twenty four (24) hours after the transfer occurs.

    b) Document the notification in:

        i) The Detainee Transfer Check List; and

        ii) The appropriate comments screen in ENFORCE.

    c) Delay the notification when there are special security concerns, but only for the
    period of time justified by those concerns.

    d) Appropriately document concerns in the detainee's A-File and the appropriate
    comments screen in ENFORCE.

3) <u>Detainee notification</u>.  Immediately prior to transfer, the sending field office will
ensure that the detainee is informed, in a language or manner he/she can understand,
that he/she is being transferred to another facility and is not being removed (if
applicable).

    a) To ensure the safety of ICE personnel, ICE will ensure that specific plans and
    time schedules are not discussed with detainees and that following notification,
    the detainee:

---

5

      i) Is not permitted to make or receive any telephone calls until the detainee reaches the destination facility;

      ii) Does not have contact with any detainee in the general population until the detainee reaches the destination facility; and

      iii) Is notified that upon admission into the receiving facility, the detainee may place a domestic phone call, at no expense to the detainee.

  b)  The sending office will ensure that the detainee notification is documented in:

      i)  The Detainee Transfer Notification form; and

      ii)  The appropriate comments screen in ENFORCE.

  c)  At the time of the transfer, ICE will provide the detainee, in writing, the name, address, and telephone number of the facility to which they are being transferred, using the Detainee Transfer Notification form. ICE place a copy of the form in the detainee's A-File.

  d)  ICE will make sure that the detainee acknowledges, in writing, that they have received the transfer destination information and that it is their responsibility to notify family members if so desired, upon admission into the receiving facility.

4) <u>EOIR notification</u>. If a detainee has pending proceedings before EOIR, ICE must submit Form I-830, *Notice to EOIR: Alien Address*. If the alien has an appeal pending with Bureau of Immigration Appeals (BIA), the BIA must be notified. In all cases, a copy of Form I-830 will be placed in the A-file.

**5.4.  Requests for Bed/Designation Transfers from Field Office to Field Office.**

1) FODs or their designees are responsible for ensuring that field offices which routinely transfer cases:

  a)  Establish a means of communication so that receiving field offices provide sending field offices daily information regarding available bed space; and

  b)  Provide the names and contact numbers of staff responsible for handling transfers.

2) While field offices are encouraged to communicate directly regarding available bed space, the headquarters Removal Management Division (RMD) is available to assist a field office that has unsuccessfully attempted to locate space.

3) Field offices seeking bed space in other field office jurisdictions should phone the request (or e-mail with a follow-up phone call) with sufficient details of the case to the designated field office contact.

6

4) Once a field office has preliminarily agreed to accept a detainee from another office, ICE will ensure that:

    a) The Form I-216, *Record of Persons and Property Transfer* is completed;

    b) Complete information detailing the alien's criminal history, medical or mental health concerns, or security risks is provided.

    c) Medical or mental health problems or prescribed medications are documented, either on Form USM-553 (or equivalent), *Medical Summary of Federal Prisoner/Alien in Transit,* or Form I-794, *In-Processing Health Screening*, and the form accompanies Form I-216;

    d) Security concerns are outlined on a separate page and attached to Form I-216; and

    e) A copy of the age verification documentation is attached if it is suspected that the detainee is a juvenile.

5) The FOD(s) or their designee(s) will arrange a method of providing medical histories to Intergovernmental Service Agreement (IGSA) facilities if the IGSA requires that the medical unit review medical histories prior to accepting a transfer.

6) The receiving field office will ensure that Form I-216 is reviewed for consistency with information previously communicated. If there are issues that were not previously relayed to the receiving field office, ICE Supervisory Immigration Officers at the receiving field office will ensure that the sending field office is notified that the transfer request may be declined unless the issues are resolved.

7) Once the receiving field office has agreed to accept the transfer of the detainee on Form I-216, the sending field office will communicate a mutually agreeable estimated time of arrival. The sending field office may not substitute any detainee on Form I-216 without prior approval of the receiving field office.

**5.5.  Detainee Transfer Checklist and Transfer Notification Form.**

1) ICE will ensure that both the Detainee Transfer Checklist and Transfer Notification Form are completed and placed in the detainee's A-File or work folder; and that the A-File or work folder accompanies the detainee to the receiving facility.

2) If the Detainee Transfer Checklist cannot be completed prior to transfer, the detainee may be transferred only if the authorized receiving FOD or his or her designee has expressly waived that procedure. The sending field office will note any such waiver in the A-File.

7

**5.6.  A-File.**

1) Prior to transfer, the sending field office will ensure that the A-File is obtained and, in accordance with the appropriate procedures of the ICE Policy Directive titled, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information":

   a) Forward the A-File to USCIS for consolidation; and

   b) Attach all documents and forms on the proper side of the A-File.

2) The sending field office will ensure that the A-File includes copies of the following properly executed documents, fastened in the file:

   a) I-216 and appropriate copies of Form I-77, Baggage Check (or IGSA equivalent);

   b) Form USM-553 or local Medical Transfer Summary form;

   c) Copy of Form I-213, *Record of Deportable Alien Form*;

   d) Original or photocopy of Form I-203/203A, *Order to Detain/Release Alien*;

   e) Detainee Transfer Checklist;

   f) Age verification documents (if applicable);

   g) A copy or printout of all previous Post Order Custody Reviews (POCRs) and travel document requests in a property envelope fastened to the file;

   h) Classification sheet;

   i) Charging documents/records of proceedings;

   j) Certified copies of convictions;

   k) Fingerprint cards;

   l) Photographs; and,

   m) Printouts from the Central Index System (CIS), ENFORCE and the FBI NCIC database.

3) If the sending field office is unable to obtain the A-File (and does not have a fully documented Temporary File), the detainee may not be transferred unless the receiving

8

field office, before the transfer takes place, accepts a work folder created by the sending field office that includes, at a minimum:

a) Certified copies of convictions or information as addressed in section 5.8;

b) Printouts from the Central Index System (CIS), ENFORCE, and the Federal Bureau of Investigation's (FBI) National Crime Information Center (NCIC) database;

c) Charging documents/copies of the EOIR record of proceedings;

d) Photographs and fingerprints;

e) A Computer Linked Application Information Management System (CLAIMS) printout;

f) A Treasury Enforcement Communications System (TECS) printout; and

g) Any other documents reasonably requested by the receiving field office.

4) The sending field office will ensure that the A-File or work folder accompanies the transfer, except for cases where the receiving field office requests that the A-File or work folder be mailed by overnight express to a particular location. If requested, the sending field office will ensure that it is mailed no later than the following business day.

5) The sending field office shall communicate as soon as possible any anticipated significant delays in the arrival time of the detainees or their files.

**5.7.      Charging Documents/Record of Proceeding.**

1) Before the transfer, all charging documents will be issued and signed by the individual with signatory authority for the sending field office.

2) If applicable, prior to transfer, all charging documents will be served on the detainee, including, but not limited to:

a) Form I-862, *Notice to Appear*;

b) Form I-200, *Warrant of Arrest*;

c) Form I-205, *Warrant of Removal*;

d) Form I-286, *Notification of Custody Decision*; and

e) Form I-826, *Notice of Rights*.

3) ICE will ensure that original charging documents or copies, if the originals have been submitted to EOIR (indicating proper service), are included in the A-File. A copy of the charging documents will be provided to the detainee.

**5.8.** **Certified Copies of Convictions.** A detainee may not be transferred if the certified copies of conviction relating to the charging document are not included in the A-File or work folder, unless the receiving field office has agreed in writing in advance to accept the case. In such instances, the sending field office will provide the Detainee Transfer Checklist point-of-contact names and phone numbers provided for:

1) The person at the sending field office responsible for obtaining the conviction record; and

2) An individual at the respective court or clerk's office where the record is located.

**5.9.** **Fingerprint Cards.** The sending field office will send the completed fingerprint cards in the A-File or work folder as noted below:

1) The cards will be signed by the alien and the official taking the fingerprints;

2) The cards will be completely filled out except for the address block requesting a disposition from the FBI;

3) The completed cards will be left in the A-File or work folder for the receiving field office to fill in the response address block and submit to the FBI and DHS Biometrics Support Center (when appropriate), unless the detainee is a Room-and-Board case (short-term staging); and

4) One fingerprint card should remain in the A-File or work folder at all times.

**5.10.** **Photographs.** The sending field office will take four (1 sheet of 4) new, standard booking-size photographs on photo quality paper and include any photos not needed for the transfer in the A-File or work folder.

**5.11.** **Medical Procedures and Information Required for Transfer.**

1) In advance of the transfer, ICE will ensure that the receiving facility is provided the USM-553 (facsimile or email is acceptable)

2) Transfer of the Detainee's Medical Record.

   a) When a detainee is transferred within the ICE Health Service Corps (IHSC) system, IHSC will provide:

   i) Form USM-553, or equivalent Medical Transfer Summary, and a copy of the detainee's full medical record; and

      ii)  The full medical record in a sealed envelope or other container labeled with the detainee's name and A-number and marked "MEDICAL CONFIDENTIAL."

  b)  When a detainee is transferred to an IGSA detention facility, ICE will ensure that the Transfer Summary will accompany the detainee. Whenever possible, a copy of the full medical record should accompany each detainee during transfer. If the full medical record is not available, it must be sent as soon as possible. FODs will work with IGSAs to make arrangement for the transfer of the full medical record.

3)  <u>Medical Transfer Summary</u>.

  a)  The sending facility's medical staff will prepare a Medical Transfer Summary that must accompany the detainee. Either Form USM-553 or a facility-specific form may be used, provided it shows:

      i)  Tuberculosis (TB) clearance, including Purified Protein Derivative (PPD) with the test dates, and chest x-ray results if the detainee has received a positive PPD reading;

      ii)  Current mental and physical health status, including all significant health issues;

      iii) Current medications, with specific instructions for medications that must be administered en route; and

      iv) The name and contact information of the transferring medical official.

  b)  The transporting officer may not transport a detainee without the Medical Transfer Summary.

  c)  The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary.

  d)  Medical information is available to staff only on a need-to-know basis.

      i)  Any officer who reviews the Medical Transfer Summary will protect the privacy of the detainee's medical information to the greatest extent possible.

      ii)  Personnel may not share medical information unless necessary to safely fulfill transportation responsibilities.

11

e)  The transporting officer will deliver the Medical Transfer Summary to medical personnel, if practicable, or other staff at the receiving facility and will advise them of any medications provided to the detainee in transit.

4)  Medical or Psychiatric Alert.

   a)  Appropriate medical staff will notify the facility administrator when they determine that a detainee's physical or mental condition requires:

      i)  Clearance by the medical staff prior to transfer; or

      ii)  Medical escort and specialized care (e.g. dialysis) during transfer.

5)  Medications.

   a)  Prior to transfer, medical staff will provide the transporting officers instructions and, if applicable, medication(s) for the detainee's care in transit.

   b)  Medical staff will ensure that the detainee is transferred with, at a minimum, seven (7) days worth of prescription medications (for TB medications, up to 15 days' supply) to guarantee the continuity of care throughout the transfer and subsequent intake process.

   c)  ICE will ensure that medications:

      i)  Are placed in a property envelope labeled with the detainee's name and A-number and appropriate administration instructions;

      ii)  Accompany the transfer; and

      iii)  If unused, are turned over to the receiving medical personnel.

**5.12.   Other Transfer Paperwork.**

1)  ICE will ensure that no detainee is transferred without a properly executed Form G-391, I-213, I-216, I-203/I-203A, or equivalent.  IGSA facilities may use a local form as long as the form provides the required information.

2)  ICE Supervisory Immigration Officers will ensure that records are checked to ascertain if the alien has a criminal history, is dangerous, or has an escape record or medical condition.  Any information of an adverse nature must be clearly indicated on the Form G-391, I-216, I-203, or equivalent, and the escorting officers will be notified of the risk and warned to take the necessary precautions.

3)  Before beginning the transfer or the detail, the escorting and transportation officers will read their instructions and clearly understand the purpose for which the detainee

12

is being removed from the facility. The officers will also discuss emergency contingency plans with a supervisor and/or authorized ICE official before departure.

4) ICE will ensure that Form I-216:

    a) Includes the detainee's name, A-number and detention category;

    b) Indicates if the detainee has a criminal conviction, a history of violence, is an escape risk, or has a medical condition that may require attention during the transfer;

    c) Notes whether the detainee is on prescription medication; and

    d) Indicates the time of arrival estimated by the sending field office.

5) ICE will ensure that Form G-391, I-203/I-203A, or equivalent:

    a) Is properly signed and clearly indicates the name and A-number of the detainee(s);

    b) Indicates the place or places to be escorted; and

    c) Notes the purpose of the trip and other information necessary to efficiently carry out the transfer, or detail.

6) The receiving field office may request that copies of Form I-203/I-203A or I-213 be transmitted directly from the sending field office to the receiving facility.

**5.13.  Property.**

1) Before transfer, the sending facility will ensure that all funds and small valuables are properly documented and closed out on Form G-589/I-77 (or local IGSA property receipt form).

2) If the receiving facility does not accept excess, oversized or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility will:

    a) Arrange to store the property elsewhere; or

    b) Process the excess property in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

3) If the detainee refuses to provide an appropriate mailing address, or is financially able but unwilling to pay for shipping, ERO may dispose of the property after providing

13

the detainee written notice in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

**5.14.  Movements via ICE-Managed Aircraft.**  When detainees are being transported by the ERO Flight Operations Unit, ICE will adhere to protocols established for ICE chartered removals

**5.15.  Post Transfer Activities.**

1) Detainee Phone Calls.

   a)  After admission into the receiving facility the FOD will ensure that all detainees are given the opportunity to make a phone call at the government's expense.

2) ENFORCE.

   a)  The sending field office will ensure that appropriate screens in ENFORCE are complete, updated, and accurate.

   b)  Once the detainee reaches his or her destination, the receiving field office will update the appropriate screens in ENFORCE.

**5.16.  Quality Assurance Review.** Consistent with the terms of this Directive, the FOD shall maintain statistics on transfers and have a quality assurance process in place to monitor all transfer decisions.

**6.      Authorities/References.**

**6.1.**   Immigration and Nationality Act, Pub. L. No. 82-414, §236(a) (1952) (codified as amended at 8 U.S.C. §§ 1101 et seq).

**6.2.**   ICE Policy Directive No. 1-32.0, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information" (Oct. 2, 2009).

14

7.      **Attachments.**

7.1.    Detainee Transfer Notification.

7.2.    Detainee Transfer Checklist.

8.      **No Private Right Statement.**   This Directive is an internal policy statement of ICE.  It
        is not intended to, does not, and may not be relied upon to create any right or benefit,
        substantive or procedural, enforceable at law by any party in any administrative, civil, or
        criminal matter.


**John Morton**
**Director**
**U.S. Immigration and Customs Enforcement**